UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No.: 13-CV-80629-RYSKAMP/HOPKINS

WILLIAMS KASPER BENDA, INC.
f/k/a SMITH WILLIAMS SHOPE
KASPER, INC. d/b/a BOCA RADIATION
ONCOLOGY ASSOCIATES,

    Plaintiff,

v.

COMPREHENSIVE CANCER CENTERS, LLC
f/k/a COMPREHENSIVE CANCERS CENTERS,
INC. et al.,

    Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

**THIS CAUSE** comes before the Court on Defendants' motion to dismiss **[DE 5]** filed on June 27, 2013.  Plaintiff filed a response in opposition **[DE 7]** on July 15, 2013.  Defendants filed a reply **[DE 8]** on July 25, 2013.  This motion is ripe for adjudication.

**I.**    **Background**

Plaintiff Williams Kasper Benda, Inc. (f/k/a Smith Williams Shope Kasper, Inc.) d/b/a Boca Radiation Oncology Associates ("BROA") brings this action for breach of third-party beneficiary contract and tortious interference with business relationship against Defendants Comprehensive Cancer Centers, LLC (f/k/a Comprehensive Cancer Centers, Inc.) ("CCC") and its parent company, Aptium Oncology, Inc. ("Aptium") (collectively, "Defendants").  According to the complaint, the facts are as follows:

1

CCC develops and manages cancer centers. One such center, the Lynn Regional Cancer Instituted – West ("LCI – W"), is located in western Boca Raton, Florida. When it was initially built, the LCI – W was not successful. So, in 2002, CCC entered into a Management Services Agreement ("MSA") with a hospital located in eastern Boca Raton, the Boca Raton Regional Hospital (the "Hospital"), to serve as an outpatient department. The Hospital was staffed by physicians from BROA, and under the MSA, the Hospital was to provide radiation oncologists to staff the LCI – W. In turn, CCC was responsible for management of the LCI – W. Aptium guaranteed CCC's performance under the MSA.

After the MSA was executed, the Hospital provided BROA with exclusive rights to provide radiation oncology services at the LCI – W from 2003 through 2019, the term of the MSA. BROA invested significant time, effort, and expense in developing a successful radiation oncology practice at the LCI – W. It did so for six years, until CCC improperly terminated the MSA and its relationship with the Hospital. As a result of the termination, CCC precluded BROA from providing further services at the LCI – W but offered to allow existing patients to continue treatment with BROA at BROA's eastern Boca Raton facility. Given the geographical difference, CCC knew this was unlikely. As a result, BROA suffered damages, including expenses incurred in developing its practice at the LCI – W, staffing costs, and lost revenue for the remaining term of the MSA.

In a separate arbitration proceeding, CCC was found liable for its early termination of the MSA and paid damages to the Hospital in the amount of $6,989,399.40. Now BROA wants a piece of the pie. BROA claims that it is a third-party beneficiary of the MSA: *i.e.*, the MSA was intended to primarily benefit BROA (Counts I and II against CCC and Aptium). BROA also claims that CCC tortiously interfered with its business relationships with the Hospital (Count

III), existing and prospective patients (Count IV), and physicians who referred patients to BROA for radiation oncology services at the LCI – W (Count V).  BROA argues that by improperly terminating the MSA and precluding BROA from providing services at the LCI – W, CCC intentionally interfered with its business relationships with the above groups.

Defendants move to dismiss BROA's claims, contending that the plain language of the MSA demonstrates BROA is not a third-party beneficiary and that BROA fails to allege sufficiently identifiable business relationships or agreements on which claims for tortious interference may stand.  Defendants also argue that CCC had a financial interest in the operation of the LCI – W and it was the source of BROA's business opportunity to staff the LCI – W; therefore, CCC contends, BROA cannot show that any interference with its relationship with the Hospital was unjustified.  For the reasons discussed below, the Court grants Defendants' motion and dismisses BROA's claims with prejudice.

**II.     Legal Standard on Motion to Dismiss**

In order to state a claim for relief, Federal Rule of Civil Procedure Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  However, the Court need not accept legal conclusions as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Further, "a court's duty to liberally construe a plaintiff's complaint in the face of a motion to dismiss is not the equivalent of a duty to re-write it for [him]."  *Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 912 (11th Cir. 1993).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678.

3

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

### III.  Discussion

#### A.  Breach of Third-Party Beneficiary Contract

To state a claim for breach of third-party beneficiary contract, a plaintiff must allege (1) the existence of a contract; (2) the clear or manifest intent of the contracting parties that the contract primarily and directly benefit the third party; (3) breach of the contract by a contracting party; and (4) damages to the third party resulting from the breach. *Networkip, LLC v. Spread Enters., Inc.*, 922 So. 355, 358 (Fla. Dist. Ct. App. 2006). The only element at issue here is the second, whether the clear intent of the Hospital and CCC was that the MSA *primarily and directly benefit* BROA.

To determine whether the Hospital and CCC intended that the MSA to primarily and directly benefit BROA, "Florida law looks to [the] nature or terms of the contract . . . ." *Jenne v. Church & Tower, Inc.*, 814 So. 2d 522, 524 (Fla. Dist. Ct. App. 2002) ("The language used in a contract is the best evidence of the intent and meaning of the parties."). "The intention of the contracting parties, gleaned from the contract itself, is determinative. It is not enough that the . . . services ultimately rendered accrue to the [third part]." *City of Tampa v. Thornton-Tomasetti, P.C.*, 646 So. 2d 279, 282–83 (Fla. Dist. Ct. App. 1994).

4

Here, BROA attaches the MSA to the complaint. Thus, the MSA is considered part of the complaint and the Court properly considers it in determining the sufficiency of BROA's allegations under Rule 12(b)(6). *See* Fed. R. Civ. P. 10(c); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). Where the MSA contradicts the allegations in the complaint, the MSA governs. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205–06 (11th Cir. 2007).

Here, the terms of the MSA contradict BROA's claim that the Hospital and CCC intended for the MSA to *primarily and directly* benefit BROA. To start, BROA is mentioned nowhere in the MSA. If the Hospital and CCC intended BROA to be the primary beneficiary of the MSA, they would have stated as much in the agreement. *See Biscayne Inv. Grp., Ltd. v. Guar. Mgmt. Servs., Inc.*, 903 So. 2d 251, 254 (Fla. Dist. Ct. App. 2005) (holding the same). Rather, the MSA provides that it inures solely "to the benefit of each Party and that of its respective permitted successors and assigns." MSA, Section 14.6.

Moreover, the MSA, itself, is comprehensive agreement concerning a broad array of management services at the LCI – W. Only one out of more than 100 provisions addresses the staffing of radiation oncologists. In pertinent part, that provision provides that "[t]he Hospital shall employ or otherwise make available radiation oncologists" at the LCI – W, but "[i]n the event that radiation oncologist . . . falls below one (1) full time on-site radiation oncologist . . . then CCC shall have the right to employ or otherwise make available radiation oncologists and radiologists to provide physician coverage." MSA, Section 5.3.1. This refutes BROA's contention that it had "exclusive rights" to provide radiation oncology services. Section 5.3.1, coupled with the MSA's express limitation that "neither Party shall have the authority to enter into any contracts binding upon the other Party, or to create any obligations on the part of the other Party," makes clear that the Hospital's ability to grant "exclusive rights" was curtailed by

5

CCC's entitlement to staff the LCI – W under certain circumstances. Thus, BROA did not have exclusive rights to provide radiation services and the purpose of the MSA, as a whole, was not to benefit BROA.

The nature and terms of the MSA indicate that it was for the benefit of the Hospital and CCC, and not primarily and directly for the benefit of BROA. While BROA benefited greatly from the MSA by staffing the LCI – W, that is not enough. The purpose of the parties' to the contract must have been to *primarily and directly* benefit BROA. A review of the MSA's terms demonstrates it was not. Any pre or post-negotiations otherwise are discarded: "Negotiations and dealings between parties cannot modify a written contract to create the parties' 'intent' when the lack of such intent is evident from the contract." *Jenne*, 814 So. 3d at 525. Here, the MSA's merger clause stating that the agreement is "the entire agreement between the Parties and supersede[s] all prior agreements and understandings" reinforces this point. The MSA, conducted prior to the Hospital and BROA's contract granting BROA "exclusive rights" to staff the LCI – W, patently contradicts BROA's allegations underlying its claim for breach of third-party beneficiary contract. BROA is not a third-party beneficiary to the MSA, and therefore, its claims under Count I and Count II fail and are dismissed with prejudice.

B. **Tortious Interference with Business Relationships**

BROA also claims CCC intentionally and unjustifiably interfered with its relationships with the Hospital, existing and prospective patients, and referring physicians. The basis for BROA's claims is two-fold: (1) CCC improperly terminated the MSA with the Hospital and (2) as a result, CCC precluded BROA from providing further radiation oncology services at the LCI – W.

To succeed in a claim for tortious interference with business relationships under Florida law, the plaintiff must demonstrate (1) the existence of a business relationship; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damages to the plaintiff as a result of the tortious interference with that relationship. *See Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994). It requires a showing of both "an intent to damage the business relationship and a lack of justification to take the action which caused the damage." *Networkip, LLC*, 922 So. 2d at 358 (citing *Smith v. Emery Air Freight Corp.*, 512 So. 2d 229 (Fla. Dist. Ct. App. 1987)). The only elements at issue are (1) whether BROA adequately alleges a business relationship with the Hospital, patients, and physicians, and (2) whether BROA demonstrates that CCC's interference was intentional and unjustified.

1. **Existence of a Business Relationship**

The first prong of a tortious interference with business relationship claim requires (1) "a business relationship evidenced by an actual and identifiable understanding or agreement," *Ethan Allen, Inc.*, 647 So. 2d at 815, and (2) "a relationship with a particular party, and not just a relationship with the general business community." *Id.* The business relationship need not be evidenced by a formal or written agreement, but it must afford the plaintiff "existing or prospective legal or contractual rights." *Id.* at 814. The plaintiff must show that an agreement would "in all probability have been completed if the defendant had not interfered." *Id.* at 815. The customer or party with whom the plaintiff is alleging to have a business relationship must be "identifiable." *See Int'l Sales & Serv., Inc. v. Austral Insulated Prods. Inc.*, 262 F.3d 1152, 1155–56 (11th Cir. 2001) (citing Florida case law and using the phrases "identifiable customer," "identifiable person," and "particular party").

7

At the first instance, BROA's claims against CCC for tortious interference with its patients and referring physicians fail. BROA does not allege—and likely cannot allege—to have any legal or contractual obligations or rights with those groups which were substantively damaged by CCC's decision to terminate the MSA. There is no allegation of "an actual and identifiable understanding or agreement" with those groups. None of the groups are alleged to have any legal or contractual obligation to BROA to use its radiation oncology services or to refer it patients. At best, the complaint describes BROA's *expectancy* that groups would continue to do business with BROA. This is not enough. *See Greenberg v. Mount Sinai Med. Ctr. of Greater Miami, Inc.*, 629 So. 2d 252, 255 (Fla. Dist. Ct. App. 1993) ("The general rule is that an action for tortious interference will not lie where a party tortiously interferes with a contract terminable at will. . . . This is so because when a contract is terminable at will there is only an *expectancy* that the relationship will continue.") (emphasis added).

Secondly, BROA does not specifically allege patients or referring physicians as identifiable persons or customers. Like *Coach Servs., Inc. v. 777 Lucky Accessories, Inc.*, 752 F. Supp. 2d 1271, 1273 (S.D. Fla. 2010), the allegation that BROA had a business relationship with "various customers" is too vague and abstract. Florida case law and the Eleventh Circuit are clear: general allegations of business relationships with unidentified customers are not sufficient to state a claim for tortious interference with business relationships. *See Int'l Sales & Servs., Inc.*, 262 F.3d at 1156; *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*, 687 So. 2d 821 (Fla. 1996). BROA's generalized allegations of business relationships with groups of patients and physicians do not suffice.

For these reasons, and reasons discussed below, BROA's claims for tortious interference with business relationships with patients (Count IV) and referring physicians (Count V) fail. In

light of the Court's finding that BROA has not—and cannot—allege that CCC directly and intentionally interfered with its relationships with its patients and referring physicians (under *Twombly and Iqbal*, mere recitations of an understanding or agreement affording BROA existing or prospective legal or contract rights are not enough), the Court dismisses Counts IV and V with prejudice.

There is no question that BROA adequately pleads this element in regards to the Hospital. Therefore, the Court proceeds to the next element at issue.

### 2. Intentional and Unjustified Interference

"An essential element of a claim for intentional interference with an advantageous business relationship is that the interference be both direct and intentional." *Lawler v. Eugene Wuesthoff Mem'l Hosp. Ass'n*, 497 So. 2d 1261, 1263 (Fla. Dist. Ct. App. 1986). As stated above, the plaintiff must show that a defendant intended to damage the alleged business relationship. *See Networkip, LLC*, 922 So. 2d at 358. Incidental harm is not sufficient. *See Lawler*, 497 So. 2d at 1263.

Moreover, the interference must be unjustified. "For the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 385–86 (Fla, Dist. Ct. App. 1999). A defendant is not a "stranger" to a business relationship if the defendant "has any beneficial or economic interest in, or control over, that relationship." *Palm Beach Cnty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. Dist. Ct. App. 2009) (citing *Nimbus Tech., Inc. v. SunnData Prods., Inc.*, 484 F.3d 1305, 1309 (11th Cir. 2007)) ("Under Florida law, a defendant is not a stranger to a business relationship, and thus cannot be held liable for tortious interference, when it has a supervisory interest in how the relationship is

conducted or a potential financial interest in how a contract is performed."). A defendant is also not a "stranger" to the business relationship if it is "the source of the business opportunity allegedly interfered with." *Genet Co. v. Annheuser Busch, Inc.*, 498 So. 2d 683, 684 (Fla. Dist. Ct. App. 1986). However, interference is only justified so long as it is not motivated *solely* out of malice and "improper methods" were not used. *See KMS Restaurant Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1326–27 (11th Cir. 2004) ("[E]ven where the defendant's motive is not purely malicious, a tortious interference claim may succeed if improper methods were used."); *see Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1225–26 (Fla. Dist. Ct. App. 1980) ("[S]o long as improper means are not employed, activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable.").

Before analyzing BROA's claim for tortious interference with its relationship with the Hospital, the Court notes that BROA fails to allege that CCC's breach of the MSA and preclusion of BROA's services at the LCI – W amount to a *direct and intentional* interference with BROA's relationships with its patients and referring physicians. Once the MSA was terminated, the Hospital no longer had the authority to choose who to staff at the LCI – W; therefore, CCC was fully within its power to preclude BROA from providing services at the LCI – W. The alleged interference with patients and physicians was merely incidental, an effect of CCC's termination of its relationship with the Hospital. Under *Lawler*, non-direct interference does not suffice to support a claim of tortious interference. *See* 497 So. 2d at 1263. Therefore, these claims fail for this reason, as well.

As to BROA's claim of tortious interference with its relationship with the Hospital, the Court starts by finding that CCC was not a "stranger" to that business relationship. As owner and manager of the LCI – W, CCC clearly had a beneficial and economic interest in the

operation of the facility, as well as a supervisory interest in the staffing of radiation oncologists there. *See Palm Beach Cnty. Health Care Dist.*, 13 So. 2d at 1094. Moreover, without the MSA, the Hospital could not have contracted with BROA to provide radiation oncology services at the LCI – W. Therefore, CCC may also be considered the "source" of BROA's business opportunity. Two questions then arise: (1) Did CCC intentionally and directly interfere with BROA's relationship with the Hospital? (2) If that question is answered in the affirmative, was CCC's interference justified?

First, CCC's alleged interference with BROA's business relationship with the Hospital was not *direct*. As discussed above, BROA had no legal right to provide radiation oncology services at LCI – W after CCC terminated the MSA with the Hospital. Thus, CCC's preclusion of BROA's services at LCI – W was not direct interference with a legal or contractual relationship; rather, it was a byproduct of CCC's decision to terminate the MSA. BROA's claim is akin to an employee arguing that a buyer tortiously interfered with his relationship with his employer (supplier) after the buyer breached its contract to purchase goods from the supplier and the employee was fired due to low production needs of the supplier. The most that can be argued is that the employee incidentally suffered from the buyer's breach of its purchase contract. Again, this is not sufficient to state a claim for tortious interference with a business relationship. *See Lawler*, 497 So. 2d at 1263.

Assuming, *arguendo*, BROA does allege that CCC directly interfered with its relationship with the Hospital, BROA cannot show that CCC's interference was unjustified. BROA concedes in its response that CCC terminated the MSA "for financial reasons." Thus, it cannot be argued that CCC acted *solely* out of malice in interfering with the Hospital and BROA's relationship. "[A] tortious interference claim may succeed if improper methods were

11

used," however. *KMS Restaurant Corp.*, 361 F.3d at 1327. Nor can it be argued that CCC interfered with BROA's relationship with the Hospital through *improper means*. CCC's termination of the contract due to financial difficulties was not improper; it was an economic decision. This does not constitute the intent necessary to maintain a cause of action for intentional interference with a business relationship. *See Networkship, LLC*, 922 So. 2d at 358 (holding that cancellation of a contract to prevent further loss does not constitute the requisite intent to form the basis of a tortious interference with business relationships claim). As BROA alleges, CCC paid out over $6 million in damages for its breach of the MSA. BROA does not— and cannot—allege that CCC terminated the MSA and precluded BROA from providing services at the LCI – W for its own advantage. Thus, even if BROA could allege direct interference, it cannot show that the interference was improper. Therefore, its claim under Count I fails.

For these reasons, BROA's claim for tortious interference with its business relationship with the Hospital (Count I) is dismissed with prejudice.

### IV. Conclusion

The Court has carefully considered the motion, response, reply, applicable law, and pertinent portions of the record. For the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** that Defendants' motion **[DE 5]** is **GRANTED**. BROA's claims are **DISMISSED WITH PREJUDICE**. The Clerk of Court is directed to **CLOSE** this case and **DENY** all pending motions as moot.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 6 day of December, 2013.

/s/ Kenneth L. Ryskamp
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE